

# IN THE
# Court of Appeals of Indiana

In re the Matter of: N.G., L.G., K.G., and D.G.
(Minor Children), Children in Need of Services

L.G. (Father) and E.G. (Mother),

*Appellants-Respondents*



FILED

Jul 09 2026, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

and

Kids' Voice of Indiana,

*Appellee-Guardian Ad Litem*

---

July 9, 2027

Court of Appeals Case No.
25A-JC-2857

Appeal from the Marion Superior Court

The Honorable Tara Y. Melton, Judge

Trial Court Cause No.
49D15-2505-JC-5043

---

**Opinion by Judge May**
Judges Mathias and Felix concur.

**May, Judge.**

[1]     E.G. ("Mother") and L.G. ("Father") (collectively, "Parents") separately
appeal the trial court's adjudication of their children as children in need of
services ("CHINS").  Parents raise, between them, the following combined
issues:

> 1. Whether the evidence supports the trial court's adjudication of
> Children as CHINS under Indiana Code section 31-34-1-1, where
> Mother and Father each challenge as clearly erroneous several of
> the findings underlying that conclusion; and

> 2. Whether the trial court violated Mother's and Father's rights
> under Indiana Code sections 31-32-2-3 and 31-34-9-7 to present
> evidence at the dispositional hearing.

We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[2]     Father and Mother are the parents of four children: N.G., born in 2012; L.G.
III, born in 2016; K.G., born in 2017; and D.G., born in 2024 (hereinafter
collectively, "Children").  Indiana's Department of Child Services ("DCS")

opened a CHINS assessment on May 12, 2025, after receiving a report of safety concerns in the home arising from law enforcement having been called to the home on more than one occasion. In the month before that date, law enforcement had been called to the home at least twice for domestic disturbances. The family also had a prior CHINS case from 2013, cause number 49D09-1301-JC-003874.[1]

[3] Two days later, DCS Family Case Manager Sydney Session ("FCM Session") interviewed three of the four children at school. D.G., then one year old, was not interviewed. K.G. told FCM Session that he had observed domestic violence between his parents and disclosed that L.G. III had touched him inappropriately under his clothes. When interviewed, N.G. and L.G. III both told FCM Session that they had not witnessed domestic violence or any inappropriate contact between the siblings.

[4] DCS filed its CHINS petitions on May 20, 2025. At the initial hearing on May 21, 2025, the magistrate removed K.G. from the home without a request from DCS.[2] The court placed K.G. with his maternal grandparents. K.G. took part

---

[1] The trial court took judicial notice of the cause number and the orders entered in that cause, but it did not admit any additional information about that cause.

[2] At the initial hearing, the magistrate read the petition's allegations aloud to the parents, including specific details about the May 12 domestic incidents, a February 2025 stabbing of Father, Mother's refusal to allow police officers inside during one domestic incident, K.G.'s reports of objects being thrown and Parents spitting on one another, and K.G.'s report that L.G. III had touched him inappropriately on twenty-five occasions. The allegations in a CHINS petition are not sworn testimony and do not constitute evidence of the facts contained therein unless independently confirmed by a witness or party at the fact-finding hearing. *Matter of D.P.*, 72 N.E.3d 976, 983 (Ind. Ct. App. 2017). We accordingly rely only on the actual evidence presented at the fact-finding hearing as we analyze the issues raised by the parties.

in a forensic interview on June 17, 2025, and was returned home before the fact-finding hearing.

**The Fact-Finding Hearing and Adjudication**

[5] The fact-finding hearing was held July 9, 2025. DCS presented testimony from FCM Session, FCM Amudalat Ross, and the family preservation therapist; the parents presented testimony from K.G.'s maternal grandfather, Mother, and the two Guardian Ad Litem ("GAL") volunteers assigned to the children. The trial court denied Parents' motion for involuntary dismissal under Trial Rule 41(B) after reviewing Exhibit 1, which was the video of the forensic interview of K.G.

[6] FCM Session testified that Parents were "not fully understanding how big of concern domestic violence can be, especially in the presence of young children." (Tr. Vol. II at 97.) Law enforcement had been called to Parents' home for domestic disturbances at least twice in the month before DCS's involvement. Of the three children FCM Session interviewed at school, K.G. reported observing domestic violence between his parents. Mother and Father had separately sent FCM Ross messages asking about divorce, which she characterized as an indication "that there's obviously something going on in the home." (*Id*. at 109.)

[7] DCS referred Mother for mental health services with a local provider. Mother testified she instead enrolled in individual therapy through BetterHelp, as well as couples counseling through BetterHelp and an anger management program. On cross-examination, DCS established that Mother had communicated

information about her BetterHelp services to FCM Ross only verbally, never in writing. The GAL for K.G. wanted documentation that Parents' reported services were in place before the case closed.

[8] On August 26, 2025, the trial court entered its Order on Fact Finding adjudicating all four children CHINS. The court found that Parents minimized the domestic violence in the home and did not understand its impact on young children and that police had responded to the home on multiple occasions. The court also found that Mother was unwilling to pursue services for her children without court compulsion and that the absence of documentation of the parents' therapy reflected non-compliance. Based on these and other findings, the court concluded Children were endangered and that their needs were unlikely to be met without the coercive intervention of the court.

**The Dispositional Hearing**

[9] The dispositional hearing was scheduled for September 24, 2025, at 11:30 a.m. The scheduling entry, which was made by the trial court on the same day as the fact-finding order, reads only: "Dispositional Hearing scheduled for 09/24/2025 at 11:30 AM." (E.G. App. Vol. II at 8.) The trial court's chronological case summary does not indicate that any party filed a witness list, a notice of intent to present evidence, or a request for a contested evidentiary hearing in the period between the fact-finding order and the dispositional hearing.

[10] At the hearing, before any witness was sworn, the trial court stated:

I want to get to what's recommended because I feel like our time would be better spent hearing testimony. . . . I think . . . there's a rational basis for [for] services in this case. . . . What we're doing is putting services in place based upon what I felt I heard at the hearing and what I- at the fact finding and what I feel like the family- is rational and reasonable for the family to complete. . . . Now that said, we'll get to the recommendations then we'll get to sworn testimony.

(Tr. Vol. II at 173.)

[11]   The court heard brief testimony from Mother on Mother's motion to ensure compliance due to an alleged difficulty communicating with DCS. The court then permitted DCS to call FCM Ross, who testified regarding the predispositional reports and DCS's recommended services. During Father's cross-examination of FCM Ross, the court interjected:

[T]he only thing that I consider to be rationally related is the home-based therapy individual and family. I do think that it's needed. I do think a DV assessment is needed and any recommendations. If they don't recommend anything, nothing will be done. . . . So, what I'd rather hear [from Parents] is why you think those two services, those services, the home-based therapy and the DV assessment are not rationally related and should not be ordered because eliciting testimony from Ms. Ross is just really long and drawn out and really won't get you where you need to be honestly. . . . I'd rather just hear from you why you don't agree with these services because I do think that they are reasonable. . . . So, [Father's counsel], you go first.

(*Id*. at 184-85.)

[12]     Rather than present argument about why those two services would not be rationally related to the CHINS disposition, Father's counsel continued cross-examining FCM Ross, as did Mother's counsel, followed by DCS's redirect. After this testimony concluded, the court asked Father's counsel:

> Isn't the proper way to do this, were you all supposed to file and ask for a contested dispositional hearing? Because I would've [set] this for a different hour had I had a request for a contested disposition. . . . I had no indication that this was going to be a contested evidentiary hearing. And I do believe everyone is supposed to have notice of that. . . . how many witnesses do you have, [Father's counsel]?

(*Id*. at 196-97.) Father's counsel responded that she had two witnesses; Mother's counsel stated he had two as well. The court responded: "Okay. So, we're not going to do this. We're not doing this. We're going to reset it for a contested evidentiary hearing because we don't do trial by ambush." (*Id*. at 197.)

[13]     Father's counsel reminded the trial court that disposition had to be completed within thirty days of the fact-finding order, and the court reversed course:

> All right, well then if that's the case, then we're going to go forward because you all didn't give me notice of an evidentiary hearing. . . . [This] is set for a 15 minute dispositional hearing because typically that's what we do. If you're going to want a [sic] evidentiary hearing, you have to request that. And that has not happened. So, you can give me a summary and we can, we can review it again and we can set it for another hearing, but today I'm going to issue a dispositional order and then you guys, if you want to ask for a contested dispositional hearing set for

later, we will do that. So right now, I need your summary argument from [Father's counsel] and [Mother's counsel].

(*Id*. at 197-98.)

[14] Father's counsel immediately objected on the record: "I would object to issuing an order, a dispositional order absent having a full evidentiary hearing on the evidence for whether or not there's a rational basis." (*Id*. at 198.) Mother's counsel joined: "I would echo all of [Father's counsel's] sentiments in her closing. . . . I would also join her in her objection." (*Id*. at 199.) The court proceeded to disposition without hearing from either parent's witnesses. In explaining its ruling, the court stated: "Everybody had an opportunity to supply, to admit evidence at the trial. So, evidence could have come from anyone about services completed, about service providers being put on the stand, they could have been subpoenaed, all of those things." (*Id*. at 201.)

[15] The trial court entered its Dispositional Order on October 15, 2025, ordering both parents to participate in home-based therapy, home-based case management, and a domestic violence assessment, and to comply with all provider recommendations.

## Discussion and Decision

### 1. The CHINS Adjudication

[16] No statute expressly requires formal findings of fact in a CHINS fact-finding order, *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014), and neither party requested findings under Indiana Trial Rule 52(A). Where, as here, the trial court enters

findings of fact and conclusions of law on its own motion, we apply a two-tiered standard of review to those findings, asking first whether the evidence supports the findings and second whether the findings support the judgment. *Matter of K.W.*, 178 N.E.3d 1199, 1210 (Ind. Ct. App. 2021). We do not reweigh evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d at 1286, 87. Findings the parents do not challenge stand as proven. *In re To.R.*, 177 N.E.3d 478, 485 (Ind. Ct. App. 2021), *trans. denied*. To the extent the trial court's sua sponte findings are erroneous, those findings are superfluous and not fatal to the judgment if the remaining valid findings and conclusions support it. *Lasater v. Lasater*, 809 N.E.2d 380, 397 (Ind. Ct. App. 2004). Where a CHINS judgment rests on issues not covered by the trial court's findings, we review those issues under the general judgment standard, affirming "on any legal theory supported by the evidence." *In re S.D.*, 2 N.E.3d at 1287 (quoting *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)).

[17] A CHINS adjudication under Indiana Code section 31-34-1-1 requires three elements: "that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and … that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287. The third element "guards against unwarranted State interference in family life, reserving that intrusion for families 'where parents lack the ability to provide for their children,' not merely where they 'encounter difficulty in meeting a child's needs.'" *Id.* (quoting *Lake Cnty. Div. of Fam. & Child. Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994)). The CHINS adjudication focuses on the

condition of the children, not on an act or omission of the parents. *Matter of K.W.*, 178 N.E.3d 1199, 1210 (Ind. Ct. App. 2021) (quoting *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010)).

[18] Father challenges thirteen of the trial court's findings, targeting both the domestic violence evidence underlying the determination of endangerment and the findings bearing on whether coercive intervention was necessary. Mother challenges four findings focused on the investigation timeline and her willingness to pursue services. We address first the finding both parents challenge, then Mother's remaining challenges and Father's remaining challenges grouped by subject matter, before considering whether the supported findings sustain the adjudication.

### A. Finding 24 – Both Parents Challenge

[19] Finding 24 states that "Mother testified that, if not for DCS involvement, she would end K.G.'s involvement in therapy" and "refused to answer whether she would take L.G. III to his [scheduled mental health evaluation] if the matter closed." (App. Vol. II at 164.)

[20] Mother contends this finding mischaracterizes her testimony because she testified she "would not be in objection to taking my son to get evaluated." (Tr. Vol. II at 137.) That statement, considered in isolation, supports her position. However, we consider the evidence supporting the trial court's decision, not isolated passages that favor the appellant. *In re S.D.*, 2 N.E.3d at 1287 (stating standard of review). Before making that statement, Mother declined three

times to give a direct yes or no answer to whether she would take L.G. III to his evaluation if the case closed. (Tr. Vol. II at 136-37.) She first asked what grounds existed for the evaluation, then twice answered only that she "would not be in objection" to taking him. (*Id.* at 137.) Separately, Mother testified that she did not believe K.G. needed his therapy and that she would end it based on what his therapist had told her. (*Id.* at 135.) The trial court struck the therapist's statement itself as hearsay, but it did not strike Mother's own statement about what she would do. (*Id.*) The trial court was entitled to weigh the full body of Mother's testimony and to conclude that her conditional, qualified responses did not reflect genuine willingness to pursue her children's services without court compulsion. We do not reweigh that determination.

[21] Father contends Finding 24 rests in part on stricken testimony. The record does not support that reading. DCS moved to strike "the hearsay statement of the therapist." (Tr. Vol. II at 135.) The trial court granted that motion, striking only what Mother conveyed the therapist had said, not Mother's own statement that she would end K.G.'s therapy. (*Id.*) Father does not identify any testimony that was actually stricken that appears in Finding 24. We accordingly hold Finding 24 is supported by the record.

### C. Mother's Remaining Challenged Findings – Findings 5, 6, & 7

[22] Mother challenges three findings describing the sequence and basis of FCM Session's initial assessment. She argues Finding 5 incorrectly states the assessment was triggered by the touching allegation when it was triggered by

domestic violence concerns, and that Findings 5, 6, and 7 together misrepresent the timeline and Mother's cooperation.

[23] FCM Session testified that she received a referral, went to the family's home and briefly spoke to Mother, went to the school to interview the children, and then met with Mother again at a Wendy's parking lot to discuss what she had learned. Findings 6 and 7 track that sequence accurately.

[24] As to Finding 7's characterization of Mother's reaction, Session testified that Mother was upset and found the school visit "embarrassing." (Tr. Vol. II at 84.) The finding states that Mother's reaction "resulted in Ms. Session having some additional concerns." (E.G. App. Vol. II at 162.) That characterization is supported by FCM Session's testimony. The trial court did not have to credit Mother's description of her own reaction.

[25] The error in Finding 5 – which does misstate the nature of the report that triggered the initial assessment by DCS – is harmless as it does not impact a determination whether Children were CHINS at the time of the adjudication. We need not reverse for errors in superfluous findings. In re B.J., 879 N.E.2d at 20.

### C. Father's Challenged Findings

#### 1. The Touching Findings – Findings 8, 23, & 25

[26] Finding 8 states: "Mother confirmed that this is not the first time that [K.G.] disclosed inappropriate touching by his brother. [K.G.] told his parents about

the inappropriate touching first. The disclosure at issue in this case was to an adult outside of his home." (E.G. App. Vol. II at 162.) Father argues no admissible evidence supports prior disclosure. However, FCM Session testified without objection that Mother told her that she had spoken with the boys about body safety "about a year prior" and had not been aware of "any subsequent touching since that conversation." (Tr. Vol. II at 85.) Father did not object to this testimony, and unobjected-to hearsay "may be considered for substantive purposes and is sufficient to establish a material fact at issue." *Banks v. State*, 567 N.E.2d 1126, 1129 (Ind. 1991). The trial court could reasonably infer from Mother's reference to subsequent touching, that K.G. had disclosed prior conduct to his parents and that this disclosure prompted the body safety conversation. We cannot disturb that inference on appeal.

[27] Finding 23 states that neither parent sought therapeutic or remedial services for K.G. or L.G. III before DCS involvement, despite "multiple incidents of inappropriate touching." (E.G. App. Vol. II at 164.) Father correctly argues that "multiple incidents" overstates what the record demonstrates. The forensic interview – Petitioner's Exhibit 1, which was admitted by stipulation – establishes one incident of inappropriate touching. Mother's statement to FCM Session about a body safety conversation a year prior supports at most a reasonable inference of one prior incident. Thus, the "multiple incidents" language in Finding 23 is not supported by the record.

[28] That error does not require reversal, however. The remainder of Finding 23 – that neither parent sought therapeutic or remedial services for either child

before DCS involvement – is fully supported. Mother told FCM Session that she had a body safety conversation with the boys and that she believed there had been no further touching since. (Tr. Vol. II at 85.) Neither parent sought any therapy, professional evaluation, or clinical intervention for K.G. or L.G. III before DCS involvement. The absence of any therapeutic response is what makes Finding 23 relevant to the CHINS determination, and that absence is established regardless of how many incidents occurred. An erroneous finding is harmless surplusage if it does not constitute the "sole support for any conclusion of law necessary to sustain the judgment." *In re B.J.*, 879 N.E.2d 7, 20 (Ind. Ct. App. 2008), *trans. denied*. "Multiple incidents" is not the sole basis for any conclusion the trial court reached; the failure to seek services after even one known incident independently supports the finding's relevance.

[29] Finding 25 states that K.G.'s disclosure "indicates he did not approve of the touching, he does not feel safe when it happens, and he wants the adults in his life to stop [it]." (E.G. App. Vol. II at 164.) Father argues the phrase "when it happens" implies ongoing conduct the record does not support – because the record establishes one incident, not a continuing pattern – and that there is no direct evidence of K.G.'s emotional state. Father is correct that "when it happens" is imprecise; the record establishes one incident in the forensic interview and one prior incident by inference. We will not reverse on this basis, however. A factfinder may draw reasonable inferences from the evidence presented. *In re S.D.*, 2 N.E.3d at 1287. The act of disclosing what happened to an FCM at school and to a forensic interviewer supports the inference that K.G.

was troubled by the conduct and wanted it to stop. The imprecision in the phrasing of Finding 25 does not undermine any conclusion the trial court reached, and any error is harmless. *See In re B.J.*, 879 N.E.2d at 20 (erroneous surplusage does not require reversal).

### 2. The Domestic Violence Findings – Findings 13, 15, 30, & 31

[30] Father challenges four findings concerning domestic violence in the home. We consider each in turn.

[31] Finding 31 states that when FCM Session spoke with K.G. at school, K.G. "disclosed that he had observed domestic violence between the parents . . . ." (E.G. App. Vol. II at 164.) This tracks FCM Session's testimony, as she stated on cross-examination that K.G. "had disclosed that he had observed domestic violence between the parents . . . ." (Tr. Vol. II at 103.) Father's counsel objected and moved to strike; the trial court overruled the objection because Mother's counsel had elicited the testimony. (*Id.*) Unobjected-to hearsay – and here the objection was overruled – "may be considered for substantive purposes and is sufficient to establish a material fact at issue." *Banks*, 567 N.E.2d at 1129. Finding 31 is supported by FCM Session's admitted testimony.[3]

---

[3] Father also argues that Session's use of the phrase "domestic violence" is a conclusory characterization of K.G.'s statement without specifics about what K.G. actually said. That observation goes to the weight of the evidence, not its admissibility, and we do not reweigh the evidence on appeal.

[32]     Finding 30 states that "recently, law enforcement was called to the home twice for domestic disturbances," (E.G. App. Vol. II at 164), and that Mother evaded the question of who had called. Father argues this finding relies on hearsay the trial court limited. He is partially correct. When FCM Ross testified on direct examination about multiple police runs to the home, the trial court stated it was not "considering it for the truth of the matter asserted." (Tr. Vol. II at 111-12.) FCM Session's testimony on the same subject is a different matter. On cross-examination by Mother's counsel – without objection – FCM Session testified that she learned law enforcement had been called to the home "at least like two times" in the last month for "domestic disturbance." (Tr. Vol. II at 101.) Because Father did not object to that testimony, it came in for substantive purposes. *See Banks*, 567 N.E.2d at 1129. Mother separately testified that she did not know who had called police or what had prompted the calls. (Tr. Vol. II at 129.) Finding 30 is supported by Session's unobjected-to testimony and by Mother's own testimony.

[33]     Finding 13 states that "[r]emoval occurred after [K.G.] disclosed inappropriate touching by his older brother and domestic violence in the family home." (E.G. App. Vol. II at 162-163.) This is a description of the sequence of events leading to K.G.'s removal, which is supported by FCM Session's testimony. (Tr. Vol. II at 103 ("he had disclosed that he had observed domestic violence between the parents and also made a disclosure of inappropriate touching")). The sequence is accurate: K.G. made both disclosures to FCM Session during

the school interview, the CHINS petition was filed, and removal was ordered at the initial hearing. Finding 13 is supported.

[34] Finding 15 states that during the forensic interview K.G. "disclosed one incident of inappropriate touching by his older brother when he was 7 years old. [K.G.] also disclosed witnessing domestic violence in their home." (E.G. App. Vol. II at 163.) DCS concedes that the second sentence is inaccurate because K.G. said nothing about domestic violence during the forensic interview. Nevertheless, the error in Finding 15 is harmless. K.G.'s domestic violence disclosure is established in the record through FCM Session's school interview testimony, as we held above regarding Finding 31, and an erroneous finding is harmless when it does not constitute the "sole support for any conclusion of law necessary to sustain the judgment." *In re B.J.*, 879 N.E.2d at 20. K.G.'s disclosure rests independently on FCM Session's admitted testimony regardless of Finding 15's misattribution.

### 3. The Remediation and Services Findings – Findings 27, 35, 36, 41, & 42

[35] Finding 27 states that DCS referred Mother for mental health services through a local provider, that Mother did not engage in that referred service, that she obtained therapy through BetterHelp instead, and that neither DCS nor her provider verified her consistent engagement. (E.G. App. Vol. II at 164.) Father argues this finding is misleading because DCS never provided Mother a release of information form to allow verification of her BetterHelp services. However, DCS did not need to provide a release of information form for Mother to call

her therapist as a witness or to present official documentation demonstrating an ongoing relationship with a therapist at the fact-finding hearing. Mother chose not to present evidence to support her self-serving testimony, and the trial court was not required to find Mother's testimony credible. We reject Father's assertion that Finding 27 is misleading.

[36] Finding 35 states: "To the extent that parents have taken remedial efforts, those have not been sufficient to remedy safety concerns for the children in their family home." (E.G. App. Vol. II at 165.) Father points to the testimony of both GALs, who testified they had no current safety concerns and would not object to case closure. (Tr. Vol. II at 160-63.) The trial court heard that testimony from the GALs, which focused on the home being physically appropriate with cameras and a room divider in place to prevent inappropriate touching between children. Their testimony did not speak to whether the therapeutic concerns identified by the fact-finding – K.G.'s disclosure of touching and his witnessing of domestic conflict – had been professionally addressed. On that question, the record shows neither parent sought any professional evaluation or therapy for K.G. or L.G. III before or during the proceedings. FCM Yates recommended that L.G. III receive a mental health assessment and that Mother receive at least a mental health evaluation. (Tr. Vol. II at 68.) However, the trial court heard all of the testimony and was not required to read the GALs' testimony as a complete resolution of the safety concern. We hold Finding 35 is supported by the record.

[37] Finding 36 states that Mother indicated she was involved in anger management, therapy, and couples counseling, but failed to provide evidence of

any of those services. Mother acknowledged that she did not provide documentation to DCS. (*See* Tr. Vol. II at 140.) She testified she provided documentation to her own counsel. The trial court was not required to believe Mother's testimony and thus Finding 36 is supported.

[38]  Findings 41 and 42 state that Children need care, treatment, or rehabilitation they are not receiving and are unlikely to receive without the coercive intervention of the court and that the family would not engage in needed services without court intervention. (E.G. App. Vol. II at 165.) Father argues the trial court did not specify what care the children were not receiving. However, no statute requires that degree of specificity in a CHINS fact-finding order, *In re S.D.*, 2 N.E.3d at 1287, and neither party requested findings under Trial Rule 52(A). Nevertheless, another of the trial court's findings – Finding 10, which was unchallenged by Parents and therefore is presumed correct, *In re To.R.*, 177 N.E.3d at 485 (unchallenged findings accepted as correct) – indicated DCS's safety concerns were Parents' minimization of domestic violence in the home, Parents' failure to understand the impact of domestic violence on young children, and the inappropriate touching between siblings.

[39]  Finding 41 – which indicates Children need care, treatment, or rehabilitation that they are not receiving and are unlikely to receive – is supported by the court's other Findings demonstrating that law enforcement was called to the home at least twice in the month before DCS involvement for domestic disturbances, that K.G. had observed domestic violence between his parents, that K.G. had been touched inappropriately by L.G. III, and that neither parent

had sought any professional evaluation or therapeutic services for K.G. or L.G. III before DCS involvement. Finding 42 – which states "the family would not engage in needed services without the coercive intervention of the court" (E.G. App. Vol. II at 165) – is supported by the fact that DCS had recommended mental health assessments for L.G. III and Mother, but Mother provided no confirmation that she was receiving treatment and Mother testified she did not believe any of the children needed services, she stated she would end K.G.'s therapy if the case closed, and she would not directly commit to taking L.G. III to his scheduled mental health evaluation. Accordingly, Findings 41 and 42 are supported by the record.

### D. The Supported Findings Sustain the CHINS Adjudication

[40] Parents argue the findings did not support that Children are endangered. However, a child's exposure to domestic violence can support a CHINS finding, and that exposure need not be repetitive to be serious. *K.A.H. v. Ind. Dep't of Child Servs.*, 119 N.E.3d 1115, 1121 (Ind. Ct. App. 2019). A trial court need not "wait until a child is physically or emotionally harmed to intervene; rather, a child may be determined to be a CHINS if his or her physical or mental condition is endangered." *In re B.W.*, 266 N.E.3d 744, 750 (Ind. Ct. App. 2025). K.G.'s disclosure that he witnessed domestic violence between his parents, in a home to which police had been called for domestic disturbances at least twice in the preceding month, and in which both parents consistently minimized those concerns to FCM Session, supports the trial court's conclusion that the children's condition was seriously endangered.

[41]   Father further argues the record contains little evidence specific to D.G. or N.G. individually. However, many of the trial court's findings are about the conditions of the household in which all four children lived, not about incidents involving particular children. Father does not contend that D.G. and N.G. lived elsewhere or that the household conditions did not apply to them. Accordingly, we find no error in this regard.

[42]   Parents also argue coercive intervention is not necessary. However, at the time of the fact-finding hearing, Mother had not sought any professional services for K.G. or L.G. III. She testified she did not believe the children needed services, she stated she would end K.G.'s therapy if the case closed, and she would not directly commit to taking L.G. III to his scheduled mental health evaluation. FCM Yates recommended at minimum that L.G. III receive a mental health assessment and that Mother receive a mental health evaluation. The trial court's conclusion that Children would not receive needed care without the coercive intervention of the court is supported by the evidence.

[43]   We accordingly affirm the trial court's adjudication of Children as CHINS.

## 2. The Dispositional Hearing

[44]   We next address whether the trial court denied Parents their statutory right to present evidence at the dispositional hearing. We review questions of statutory interpretation de novo. *Morales v. Rust*, 228 N.E.3d 1025, 1033 (Ind. 2024).

[45]   Indiana Code section 31-32-2-3(b) provides that a parent is entitled "to obtain witnesses or tangible evidence by compulsory process" and "to introduce

evidence on behalf of the parent." Indiana Code section 31-34-9-7, as amended effective July 1, 2025, provides that parents "have all rights of parties under the Indiana Rules of Trial Procedure, including rights of discovery, subpoena, examination of witnesses, and presentation of evidence at any hearing, including a fact finding hearing." Neither statute conditions the right to present evidence on any prior request, notice, or designation of the hearing as "contested." DCS does not dispute that parents have a statutory right to present evidence at a CHINS dispositional hearing. (*See* DCS Br. at 35.)

[46] The trial court told counsel before any dispositional witness was sworn that it had already determined services were "rational and reasonable" based on the fact-finding hearing. (Tr. Vol. II at 173.) While FCM Ross was still testifying, the court told both parents' counsel that presenting further testimony "really won't get you where you need to be," (*id*. at 184-85), and invited argument instead. Counsel continued examining the witness rather than shifting to argument. Only after DCS's redirect concluded did the court ask whether anyone had requested a "contested dispositional hearing."[4] (*Id*. at 196-97.) When Parents indicated they each had two witnesses, the court's initial response was to reset the matter: "We're going to reset it for a contested evidentiary hearing because we don't do trial by ambush." (*Id*. at 197.)

---

[4] Prior to any testimony, the trial court said: "Now that said, we'll get to the recommendations then we'll get to sworn testimony." (Tr. Vol. II at 173.) This statement prior to testimony seems at odds with the trial court's statement that it did not know there would be multiple sworn witnesses.

Father's counsel then noted the thirty-day statutory deadline for disposition, Ind. Code § 31-34-19-1, and the court reversed itself, proceeded to disposition that day, and told the parents they could request a contested hearing afterward. Father's counsel immediately objected to proceeding without an evidentiary hearing, and Mother's counsel joined that objection before either gave summary argument.

[47] The trial court's stated rationale – that the parties had failed to request a "contested dispositional hearing" and that the matter was "set for a 15 minute dispositional hearing," (Tr. Vol. II at 197) – is not supported in the record. The CCS reflects only that the hearing was scheduled for 11:30 a.m.; no party, including DCS, filed any notice of witnesses, time estimate, or request for an evidentiary hearing before September 24, 2025. (E.G. App. Vol. II at 8.) Whatever practice the trial court believed governed scheduling of dispositional hearings, that practice does not appear to have been disclosed to the parties in advance and was not applied to DCS, which was permitted to present a full witness without any such notice having been given. Nor did DCS object to Mother and Father each presenting witnesses.

[48] By the time the court raised the contested hearing requirement, DCS had already presented its case, and the court had already stated its view of the appropriate outcome. The parents were denied the opportunity to present any evidence at all.

[49] DCS does not dispute that Indiana Code sections 31-32-2-3 and 31-34-9-7 entitled Parents to present evidence at a dispositional hearing. It argues instead that Parents waived any claim arising from the trial court's refusal to hear their witnesses. DCS provides two arguments for waiver.

[50] DCS argues that Father's counsel waived Parents' evidentiary claim by raising the thirty-day statutory deadline immediately after the trial court offered to reset the matter for a contested hearing, causing the court to withdraw that offer. Waiver requires the "intentional relinquishment or abandonment of a known right." In re N.C., 83 N.E.3d 1265, 1267 (Ind. Ct. App. 2017) (quoting Plank v. Cmty. Hosps. of Ind., Inc., 981 N.E.2d 49, 53 (Ind. 2013)). The thirty-day requirement of Indiana Code section 31-34-19-1 is a limit on the trial court, not a right belonging to the parties that counsel could trade away. When Father's counsel noted the deadline, she was not declining a remedy — she was flagging a statutory time limit, and that time limit did not foreclose the continuance the court had just offered. Indiana Code section 31-34-19-1(b) provides that failure to complete the dispositional hearing within thirty days results in dismissal only upon a party's motion, not automatically. Because Father's counsel was seeking a hearing, not moving to dismiss, the thirty-day deadline created no obstacle to a brief continuance that would have allowed both sides to present evidence. See Matter of Ar.B., 199 N.E.3d 1232, 1239-40 (Ind. Ct. App. 2022) (holding a party waives a challenge to the timeliness of a dispositional hearing by failing to move to dismiss before the hearing, and reasoning that the deadline's sole consequence is dismissal upon motion). The trial court instead

chose to proceed without hearing Parents' evidence, and Father's counsel objected to that choice on the record at her first opportunity, before giving the summary argument the court requested. (Tr. Vol. II at 198.) Counsel's identification of a statutory deadline, followed immediately by an objection to the court's chosen resolution of it, is not an intentional relinquishment of the right to present evidence.

[51] DCS's second argument is that Parents' failure to make an offer of proof describing what their witnesses would have said forfeited any claim of error. DCS is correct that Indiana law ordinarily requires a party to make an offer of proof to preserve a claim that the exclusion of evidence was erroneous, *see* Ind. Evid. Rule 103(a), so that a reviewing court can assess what was excluded and whether its exclusion mattered. However, that requirement presupposes a setting in which counsel has the opportunity to identify the evidence at issue. A party traditionally makes an offer to prove after the trial court has sustained an objection to the admission of the party's evidence. *Harman v. State*, 4 N.E.3d 209, 216 (Ind. Ct. App. 2014). Nothing of that kind occurred here. The trial court did not rule on any witness or any item of evidence. When the court learned that each parent had witnesses to call, it declined to hear from any of them and proceeded directly to its ruling. Counsel were never in a position to make an offer of proof because the court foreclosed the presentation of evidence before identifying what that evidence would be. We will not treat the absence of an offer of proof as forfeiting a claim where the trial court's own ruling made an offer of proof impossible to make.

Because Father did not waive his argument and the trial court denied Parents their statutory right to present evidence at the dispositional hearing, we reverse the Dispositional Order entered October 15, 2025, and remand for a new dispositional hearing.[5] At that hearing, Parents shall be permitted to present evidence, including but not limited to the witnesses they were prepared to call on September 24, 2025, and any evidence of services completed or engaged in since that date. DCS may likewise present any updated information. The trial court shall enter a new dispositional order based on the evidence presented at that hearing.

## Conclusion

Parents arguments regarding the validity of the findings and conclusions supporting the CHINS adjudication fail, and we accordingly affirm the adjudication of Children as CHINS. However, the trial court denied Parents their statutory right to present evidence prior the entry of a dispositional decree, and we accordingly reverse the trial court's dispositional order and remand for further proceedings in accordance with this opinion. Thus, we affirm in part, reverse in part, and remand for further proceedings.

Affirmed in part, reversed in part, and remanded.

---

[5] Father also argues the trial court's conduct violated his rights under the Fourteenth Amendment to the United States Constitution, Article 1, Section 12 of the Indiana Constitution, and *Matter of A.B.*, 226 N.E.3d 791 (Ind. Ct. App. 2023). Because the statutory grounds discussed above are dispositive, we need not reach these constitutional arguments.

Mathias, J., and Felix, J., concur.

ATTORNEY FOR E.G. (MOTHER)

Don R.  Hostetler
Indianapolis, Indiana


ATTORNEY FOR L.G. (FATHER)

Christopher Taylor-Price
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana


ATTORNEYS FOR INDIANA DEPARTMENT OF CHILD SERVICES

Theodore E.  Rokita
Indiana Attorney General
Indianapolis, Indiana

Samuel J.  Dayton
Supervising Deputy Attorney General
Indianapolis, Indiana